**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
*Southern Division*

|  |  |  |
|---|---|---|
| | * | |
| **KINGSLEY O. FIANKO,** *et ux.*, | * | |
| **Plaintiffs,** | * | |
| **v.** | * | **Case No.: PWG-12-2025** |
| | * | |
| **UNITED STATES OF AMERICA,** | * | |
| | * | |
| **Defendant.** | * | |

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

**MEMORANDUM OPINION**

This Memorandum Opinion addresses Defendant United States of America's Motion to Dismiss, ECF No. 7, and accompanying Memorandum in Support, ECF No. 7-1; Plaintiffs Kingsley O. Fianko and Cynthia Fianko's Opposition, ECF No. 10; and Defendant's Reply, ECF No. 11. Also filed in relation to Defendant's Motion was a March 28, 2013 Status Report, ECF No. 14; a Supplemental Memorandum in Support of Defendant's Motion to Dismiss, ECF No. 23; and a Supplemental Memorandum in Opposition to Defendant's Motion to Dismiss, ECF No. 24. On February 25, 2013, the Court held a telephone conference call and on April 24, 2013, the Court held a motions hearing to address Defendant's Motion. *See* Docket. For the reasons stated herein, Defendant's Motion to Dismiss is GRANTED.

## I. BACKGROUND

Plaintiff Kingsley O. Fianko and his wife, Cynthia Fianko, filed suit against the United States on July 9, 2012, alleging negligence, false arrest, false imprisonment, and loss of

consortium under the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b), 2402, 2671–80 ("FTCA"), stemming from Plaintiff K. Fianko's arrest by Maryland State Police on June 20, 2008 and subsequent detention by the United States Army. In their Complaint, Plaintiffs assert that, following Plaintiff K. Fianko's release from active duty, the United States Army negligently and erroneously classified him as a Captain in the Army Reserve. When he failed to report for active duty after having received orders mobilizing him for training and active duty service in Iraq, the Army swore out charges of desertion against him under the Uniform Code of Military Justice ("UCMJ") and issued the deserter warrant that led to his June 20, 2008 arrest. Compl. ¶¶ 6–11, ECF No. 1. Following Plaintiff's arrest, he was detained by the Army for several weeks pending desertion charges until the Army attorneys in Fort Knox, Kentucky made a discretionary determination not to prosecute him. *See id.* ¶¶ 12–18.

### a. Factual Background

As the underlying facts of this case are complex, an explanation of the timeline of events is helpful to frame Plaintiffs' claims. The facts are not in dispute by either party. On January 22, 1994, Plaintiff enlisted in the United States Army. *See* IWS-Personnel Actions, Def.'s Mot. Ex. 1, ECF No. 7-2. From 1994 through early 2000, Plaintiff served "in the active reserves" and, in February of 2000, began active duty. Compl. ¶ 7. Later that year, on October 17, 2002, Plaintiff graduated from Officer Candidate School and was appointed as a Reserve Commissioned Officer in the United States Army with the rank of Second Lieutenant. *See* 17 October 2002 Appointment Memorandum, Def.'s Mot. Ex. 2, ECF No. 7-3. At that time, Plaintiff also executed a Form DA 71, "Oath of Office." *See* Oath of Office, Def.'s Mot. Ex. 3, ECF No. 7-4. Plaintiff served on active duty as a chemical warfare officer and reached the rank of Captain. Compl. ¶ 7. In 2005, while at his last active duty station in South Korea, Plaintiff requested to

resign his commission at the conclusion of his active duty obligation. Pls.' Opp'n 2. However, at the time, the Army erroneously believed that Plaintiff had a remaining mandatory Military Service Obligation ("MSO") that would not expire until August 22, 2007.[1]  *See* 2006 DD-214, Def.'s Mot. Ex. 4, ECF No. 7-5; *see also* Pls.' Opp'n 2. Plaintiff, under the belief that he continued to have an MSO following his release from active duty, "requested to join the [United States] Army Reserves [sic]. . . upon completion of his pending active duty assignment." Def.'s Mem. 3; Pls.' Opp'n 2. Plaintiff alleges that he accepted a Reserve appointment "on the condition, and only on the condition, that his designator be changed from Chemical Warfare to Strategic Military Intelligence." Pls.' Opp'n 2. Believing that it would, on March 18, 2006 Plaintiff signed a DA Form 5691-R, "Request for Reserve Component Assignment Orders. *See* Request for Reserve Component Assignment Orders, Def.'s Mot. Ex. 5, ECF No. 7-6. Incorporated within the DA Form 5691-R was a "Soldier's Statement of Understanding," which memorialized Plaintiff's understanding that he was to report to his designated unit within thirty days of July 1, 2006, the date his active duty term of service expired. *Id.* at Box 5, 8. The DA Form 5691-R also indicated that Plaintiff's remaining MSO was "indefinite." *Id*. at Box 6. On March 28, 2006, Plaintiff received orders that his discharge from active duty would be July 1, 2006 and that he had "incurred an Individual Ready Reserve obligation." *See* 28 March 2006 Orders, Def.'s Mot. Ex. 6, ECF No. 7-7. While still on active duty in Korea, on April 21, 2006, Plaintiff executed another "Oath of Office" acknowledging his United States Army Reserve obligation. *See* Oath of Office, Def.'s Mot. Ex. 7, ECF No. 7-8. A week later, on April 28, 2006, Plaintiff received orders amending his March 28, 2006 orders concerning his reserve

---

[1]  As discussed below, the Army has since acknowledged that its initial calculation of Plaintiff's MSO was incorrect—that is, at the time of his discharge from active duty, Plaintiff actually had fulfilled his service obligations. *See* Mar. 28, 2013 Status Report 2; Def.'s Supplemental Mem. 1–2.

obligation.  *See* 28 April 2006 Orders, Def.'s Mot. Ex. 8, ECF No. 7-9.  The amended orders assigned Plaintiff to the 3438th Military Intelligence ("MI")  Battalion at Bolling Air Force Base and directed him to  report to his unit after July 1, 2006, the date his active duty term of service expired.  *See id.*  On July 1, 2006, Plaintiff was released from active duty and discharged from the United States Army.  Compl. ¶ 9.

Just over one month later, on August 6, 2006, Elizabeth Key, Human Resources Assistant at the Army's Human Resources Command, sent Plaintiff a new Oath of Office form because the Army determined that the April 21, 2006 Oath was defective.  Def.'s Mem. 5.  Specifically, the form was defective because Plaintiff signed the April 21, 2006 Oath before he was discharged from the Regular Army, which is improper, and the form had an invalid signature line.  *See id.* The new Oath, however, did not reflect that Plaintiff would be assigned to a MI unit, as he contends he was promised he would be, but rather classified Plaintiff as a Chemical Warfare Officer.  Pls.' Opp'n 3.  Plaintiff did not sign the new Oath and alleges that he did not do so because "he was still negotiating with the Reserves [sic]" regarding his request for classification as a Military Intelligence specialist.  *Id.*

Having not received Plaintiff's executed Oath, on March 20, 2007, Ms. Key contacted Plaintiff again and requested that he "execute the attached Oath of Office and return it to me by April 13, 2007."  *See* Elizabeth Key Correspondence, Def.'s Mot. Ex. 9, ECF No. 7-10.  Plaintiff acknowledges that he received the new Oath of Office but that he did not sign it.  *See* Pls.' Opp'n 3.  Indeed, Plaintiff asserts that "at no time did he ever complete the required Oath of Office," and he "knew that since he had never signed the requisite [O]ath of [O]ffice, he had never been properly gained or joined into the active reserves."  *Id.*

On March 15, 2006, five days before Ms. Key's last email to Plaintiff, Plaintiff was ordered to 400 days of active duty in support of Operation Iraqi Freedom. *See* 17 March 2007 Orders, Def.'s Mot. Ex. 10, ECF No. 7-11. Plaintiff was ordered to report on May 7, 2007. *See id.* Then, on March 26, 2007, Plaintiff was ordered to active duty for nineteen days of pre-deployment training at Fort Sheridan and was to report by April 4, 2007. *See* 26 March 2007 Orders, Def.'s Mot. Ex. 11, ECF No. 7-12. These orders were sent to Plaintiff at his address at 10132 Little Pond Place, Montgomery Village, MD 20886. *See id.* Plaintiff failed to report for training on April 11, 2007, as ordered. Def.'s Mem. 6. Plaintiff was paid for a period of active duty from April 11–29, 2007, s*ee* Pay Records, Def.'s Mot. Ex. 12, ECF No. 7-13, but represented to the Court at the April 24, 2013 hearing that he subsequently returned that money to the United States.

On April 20, 2007, the Army sent Plaintiff an additional notification regarding his obligation to report for training and, although Plaintiff signed for the notification, he did not report as ordered for a second time. Def.'s Mem. 6. On May 7, 2007, the Army listed Plaintiff as absent without leave ("AWOL"). *See* DA Form 4187, Def.'s Mot. Ex. 13, ECF No. 7-14. The Army then sent a letter to Plaintiff's family requesting that the family "please urge him to return immediately to military control at the nearest military installation in order to avoid serious consequences or prolonged unauthorized absence." *See* Next of Kin Notification, Def.'s Mot. Ex. 14, ECF No. 7-15. Plaintiff's brother, George Fianko, signed for the letter, but Plaintiff still failed to report. Def.'s Mem. 6. At some point prior to the Army classifying Plaintiff as a deserter, Plaintiff engaged in some number of telephone conversations with Army officials. *Id.*; *see* Pls.' Opp'n 3 ("This began a series of communications between [Plaintiff] and several reserve units . . . about whether he could start drilling as a reservist and when, if ever, he would

be re-classified as a Military Intelligence specialist."). Defendant contends that during these telephone discussions, Plaintiff "claimed that he was no longer in the Army . . . that he had completed his commitment . . . [and] flatly refused to report for duty." Def.'s Mem. 6. Of particular relevance, "[a]t no time did [Plaintiff] ever complete the required Oath of Office." Pls.' Opp'n 3.

Having confirmed that Plaintiff did not intend to report for duty, on July 25, 2007, Major Denise M. Wurzbach submitted a DA Form 4187, designating Plaintiff an absentee deserter. *See* DA Form 4187, Def.'s Mot. Ex. 15, ECF No. 7-16. The following day, on July 26, 2007, Major Wurzbach signed a DD Form 553, Deserter/Absentee Warrant. *See* DD Form 553, Def.'s Mot. Ex. 16, ECF No. 7-17. On September 26, 2007, the Army issued a DD Form 458, officially charging Plaintiff with desertion, a criminal offense under the UCMJ. Def.'s Mot. Ex. 17, ECF No. 7-18. The Summary Court-Martial Convening Authority preferred charges against Plaintiff the following day. *Id.* at Box 13.

Approximately nine months later, on June 20, 2008, acting under authority of the deserter warrant, the Maryland State Police arrested Plaintiff. Compl. ¶¶ 12–13. Plaintiff first was transferred to Fort Myer, Virginia, *id.* ¶ 14, and then on June 22, 2008, was transferred to Fort Knox, Kentucky, where he was held until August 7, 2008, *id.* ¶ 15. Plaintiff alleges that while in Army custody, he was "forced to stay in dilapidated barracks," was not permitted "visitation privileges," and was not fed adequately. *Id.* ¶ 15. Following an investigation of Plaintiff's case, on August 4, 2008, an Army lawyer issued a Memorandum for Record, which stated: "A thorough review of the case file and evidence indicates that CPT Fianko did not complete the requisite Oath of Office and hence, the Army does not have UCMJ jurisdiction over CPT Fianko. As such, he was never AWOL in violation of the UCMJ." *Id.* ¶ 16. The Memorandum also

directed that Plaintiff be immediately released from Army custody. *Id.* Upon release from Fort Knox, Plaintiff alleges that he was not provided shelter, transportation, or financial assistance to travel back to his home in Maryland. *Id.* ¶ 17.

### b. Procedural Background

Subsequently, on July 9, 2012 Plaintiffs filed the present action against the United States. *See* Docket. On October 26, 2012, Defendant moved to dismiss Plaintiffs' Complaint in its entirety. *See* Def.'s Mot. 1. In its Motion, Defendant argues four alternative grounds for dismissal of Plaintiffs' claims: (1) "[T]he *Feres* doctrine of intra military immunity completely precludes subject-matter jurisdiction"; (2) "Plaintiffs failed to comply with the [Federal Tort Claims Act]'s statute of limitations, 28 U.S.C. § 2401(b), by not presenting an administrative claim to the appropriate federal agency within two years after their claims accrued"; (3) "Plaintiffs cannot show that their negligence claims would fall within the FTCA's waiver of immunity because the "private party analog requirement is not satisfied, since the United States owed no duty to them under any local law"; and (4) "Plaintiffs' false arrest and false imprisonment claims are not embraced within the "law enforcement proviso" of 28 U.S.C. § 2680(h), and are not viable . . . inasmuch as [Plaintiff]'s arrest and detention followed the issuance of lawful process."[2] Def.'s Mem. 2. As Defendant's first argument regarding the *Feres* doctrine raises a jurisdictional issue and needed additional factual clarity, the Court endeavored to determine its applicability before addressing the remaining arguments in Defendant's Motion. The *Feres* doctrine bars suits filed by service members against the United States that "arise out of or are in the course of activity incident to service." *Feres v. United States*, 340 U.S. 125

---

[2] Because the first two defenses raised by Defendant focus on this Court's jurisdiction to decide the merits of this case, they will be the focus of this Memorandum Opinion and Order. Having concluded that subject matter jurisdiction is lacking, it is unnecessary to address Defendant's remaining defenses.

(1950).  Defendant, in its Motion to Dismiss, contends that the *Feres* doctrine bars Plaintiff's suit because "[a]t the time the deserter warrant was issued, [Plaintiff] had an unfulfilled mandatory service obligation to the military, was a member of the Individual Ready Reserve, and it is the very dispute about his military status that led to his alleged injuries."  Def.'s Mem. 16.  Plaintiff disagrees and argues that because he had been released from active duty effective July 1, 2006, and had not yet executed a valid Oath of Office completing his acceptance of a reserve commission, Plaintiff was, effectively, a civilian who had no military status at the time the "Army decided to declare [Plaintiff] a deserter and issue a warrant for his arrest."  Pls.' Opp'n 5–6.

On February 25, 2013, during a telephone conference call with the parties, the Court first requested clarification from Defendant regarding the calculation of Plaintiff's MSO.  *See* Docket.  Pursuant to that request, Defendant submitted a status report on March 28, 2013, which revealed, for the first time, that "Plaintiff's 2006 DD Form 214 references an incorrect MSO."  Mar. 28, 2013 Status Report ¶ 4, ECF No. 16 (emphasis in original).  Moreover, Defendant recognized that "although Plaintiff incurred additional contractual service obligations through re-enlistment and completion of Officer Candidate School ("OCS") in 2002, by the time he left active duty in 2006, those obligations would have been satisfied."  *Id.* ¶ 5.  Thus, at the time that Plaintiff was discharged from the regular Army, he had no remaining MSO.  Seeking further factual clarification, on April 24, 2013, the Court held a motions hearing to explore further, *inter alia*, what exactly Plaintiff's military status was when the Army classified him as a deserter and issued the warrant that led to the arrest which forms the basis of Plaintiff's claims.  *See* Docket.  During that hearing, Counsel for Defendant conceded that Plaintiff likely had no military status during the relevant time period.  In the interest of thoroughness, the Court determined that

additional briefing on the issue of Plaintiff's military status was necessary, and granted the Government additional time to consult the Administrative Law Division of the Office of the Army Judge Advocate General as well as to analyze existing case law to further its argument that *Feres* bars Plaintiff's suit. Pursuant to the supplemental briefing schedule authorized by the Court, the Government filed a Supplemental Memorandum of Law in Support of Motion to Dismiss and Plaintiff filed a Supplemental Memorandum of Law in Opposition to Defendant's Motion to Dismiss.

Defendant's Supplemental Memorandum confirms that Plaintiff "had no military status after he was released from active duty on July 1, 2006" but argues that nevertheless, "*Feres* remains applicable because the injuries complained of in this case are based upon negligent or wrongful conduct that occurred incident to military service." Def.'s Supplemental Mem. 1–2. Plaintiff argues, in his Supplemental Opposition, that Plaintiff's injuries did not arise out of activities incident to service but rather, resulted from Plaintiff "exercising his prerogative, as any civilian might, to decline to accept an appointment in the active army reserves by refusing to sign the oath of office" after he had been discharged from the Regular Army. Pls.' Supplemental Mem. 5. Accordingly, Plaintiff argues, *Feres* does not preclude his suit. *See id.*

## II. STANDARD OF REVIEW

As noted, Defendant raises four alternative arguments for dismissal in its Motion to Dismiss. The first two raise the issue of subject matter jurisdiction. *See Moore v. United States*, Civil No.: CCB-08-1352, 2008 WL 4659048, at *2 (D. Md. Oct. 20, 2008) (citing *Kokotis v. U.S. Postal Serv.*, 223 F.3d 275, 278 (4th Cir. 2000)); *see also Schnitzer v. Harvey*, 389 F.3d 200, 202 (D.C. Cir. 2004) ("A motion to dismiss under the *Feres* doctrine is treated as a motion to dismiss for lack of subject-matter jurisdiction.") (citations omitted). Federal Rule of Civil Procedure

12(b)(1) provides that a party may assert a lack of subject matter jurisdiction, by motion, as a defense to a claim for relief. A defendant may move to dismiss a complaint based on lack of subject matter jurisdiction based on two theories. *See, e.g.*, *Fontell v. MCGEO UFCW Local 1994*, Civil No. AW-09-2526, 2010 WL 3086498, at *3 (D. Md. Aug. 6, 2010); *Walker v. U.S. Dep't of the Army*, 60 F. Supp. 2d 553, 555 (E.D. Va. 1999). First, a defendant may assert that "a complaint simply fails to allege facts upon which subject matter jurisdiction can be based." *Adams v. Bain*, 697 F.2d 1213, 1219 (4th Cir. 1982). In this instance, "the facts alleged in the complaint are assumed to be true and the plaintiff, in effect, is afforded the same procedural protection as he would receive under a 12(b)(6) consideration." *Id.* Second, a defendant may allege that the "the jurisdictional allegations in the complaint are not true." *Fontell*, 2010 WL 3086498, at *3. When this occurs, "the Court may . . . consider matters beyond the allegations in the complaint." *Id.* The Court "regard[s] the pleadings' allegations as mere evidence on the issue," and its consideration of additional evidence does not "convert[] the proceeding to one for summary judgment." *Richmond, Fredericksburg & Potomac Ry. v. United States*, 945 F.2d 765, 768 (4th Cir. 1991); *see Adams*, 697 F.2d at 1219 ("A trial court may consider evidence by affidavit, depositions or live testimony without converting the proceeding to one for summary judgment."). Here, Defendant challenges Plaintiff's contention that his injury did not arise from activity incident to his military service, as well as his contention that he presented his claims to the appropriate federal agency within the two-year period prescribed by the FTCA. *See* Def.'s Mem. 16, 24–25. Thus, Defendant's Motion to Dismiss undertakes the second theory and challenges the truthfulness of the jurisdictional allegations in the Complaint. *See id.* As such, the Court may "consider matters beyond the allegations in the complaint" in ruling on Defendant's Motion. *See Fontell*, 2010 WL 3086498, at *3.

Notably, when a defendant challenges subject matter jurisdiction, the burden is on the plaintiff to prove that subject matter jurisdiction exists. *See Evans v. B.F. Perkins, Co.*, 166 F.3d 642, 647 (4th Cir. 1999); *El-Amin v. Int'l Longshoremen's Ass'n Local No. 333*, Civil No. CCB-10-3653, 2011 WL 2580630, at *2 (D. Md. June 28, 2011). "A court should grant a Rule 12(b)(1) motion 'if the material jurisdictional facts are not in dispute and the moving party is entitled to prevail as a matter of law.'" *El-Amin*, 2011 WL 2580630, at *2 (quoting *Evans*, 166 F.3d at 647).

## III.    DISCUSSION

### a.  *Feres* doctrine

As Defendant's first argument raises an issue which, if found to be meritorious, would deprive the Court of jurisdiction to determine whether the Army negligently classified Plaintiff as a deserter, issued a warrant for his arrest, and held him in custody while criminal charges under the UCMJ were pending, much of the this court's initial focus surrounded the applicability of the *Feres* doctrine. That inquiry largely was driven by the question of whether Plaintiff had any military status at the time he was ordered to active duty, classified as a deserter when he refused to obey those orders, and arrested and charged with desertion before being released when Army prosecutors determined that he could not be prosecuted. Initially, Defendant was of the view that Plaintiff did have military status at these times, because he continued to have an MSO after he was released from active duty when his tour in Korea ended. *See* Def.'s Mem. 3. As a result of inquiries by the court, however, Counsel for Defendant agreed to conduct additional research into whether Plaintiff had any lingering military status when he was arrested. *See* Mar. 1, 2013 Correspondence, ECF No. 14; May 7, 2013 Correspondence, ECF No. 21. Defendant's Counsel undertook this additional inquiry with the utmost professionalism and candor.

Ultimately, Defendant determined that the Plaintiff had no residual military status after he was released from active duty in Korea, and that the Army's belief that he continued to have an unfulfilled MSO that authorized him to be ordered to active duty for training and mobilization for assignment to Iraq was in error. *See* Def.'s Supplemental Mem. in Supp. 1. There is nothing in the record to suggest that this was anything other than a good faith mistake, which if culpable at all, would amount to nothing more than ordinary negligence. Defendant argues that, notwithstanding this error and the fact that Plaintiff had no military status at the time he was classified as a deserter and arrested, the *Feres* doctrine still deprives this court of subject matter jurisdiction. *Id.* at 1–2. Specifically, Defendant asserts that *Feres* nonetheless bars Plaintiff's suit because the events that caused the Army to believe that Plaintiff continued to have military status originated when Plaintiff did have military status—"the injuries complained of in this case are based upon negligent or wrongful conduct that occurred incident to military service." *Id.* at 2. Plaintiff disagrees and maintains, as he has throughout this litigation, that *Feres* is inapplicable because he had no military status when he was arrested, detained and prosecuted. Pls.' Supplemental Mem. in Opp'n 2–5.

The *Feres* doctrine has been a nearly impregnable barrier to negligence lawsuits under the Federal Tort Claims Act by servicemembers for more than sixty years. Distilled to its essence, the doctrine precludes such suits when the alleged "injury arose out of or during the course of an activity incident to [military] service." *United States v. Johnson*, 481 U.S. 681, 684 (1987) (internal quotation marks omitted). Various justifications have been offered for the doctrine: (1) The "the relationship between the Government and members of its Armed Forces is distinctively federal in character"; (2) "[T]he Veterans' Benefits Act establishes, as a substitute for tort liability, a statutory 'no fault' compensation scheme which provides generous pensions to

injured servicemen, without regard to any negligence attributable to the Government"; and (3) The "peculiar and special relationship of the soldier to his superiors, the effects of maintenance of such [tort] suits on discipline, and the extreme results that might obtain if suits under the Tort Claims Act were allowed for negligent orders given or negligent acts committed in the course of military duty" would have an unacceptable deleterious effect on the operation of the military. *Id.* at 684 n.2 (internal quotation marks omitted). Thus, "the *Feres* doctrine has been applied consistently to bar all suits on behalf of servicemembers against the Government based upon service-related injuries". *Id.* at 687–88.

Despite its resilience, the *Feres* doctrine has been the subject of pointed criticism. Indeed, writing in dissent for himself and three others, Justice Scalia has stated, bluntly, "[i]n sum, neither the three original *Feres* reasons nor the *post hoc* rationalization of 'military discipline' justifies our failure to apply the [Federal Tort Claims Act] . . . as written. *Feres* was wrongly decided and heartily deserves the 'widespread, almost universal criticism' it has received." *Johnson*, 481 U.S. at 700–01 (quoting *In re "Agent Orange" Prod. Liab. Litig.*, 580 F. Supp. 1242, 1246 (E.D.N.Y. 1984). Regardless, the Fourth Circuit staunchly has upheld the *Feres* doctrine, observing that:

> [T]he relevant inquiry is not whether the particular lawsuit involves a challenge to a military order. Rather, the proper question is whether the plaintiff's claims 'are the *type* of claims that, if generally permitted, would involve the judiciary in sensitive military affairs at the expense of military discipline and effectiveness.

*Stewart v. United States*, 90 F.3d 102, 106 (4th Cir. 1996) (quoting *United States v. Shearer*, 473 U.S. 52, 59 (1985)) (emphasis in original). The Fourth Circuit has distilled the analysis to the following maxim: "In the broadest sense, the *Feres* doctrine removes military governance from the rubric of civilian tort law. The doctrine has its defenders and its detractors. That it may elicit

criticism 'does not relieve this court of its obligation to apply precedent.'" *Id.* at 106 (quoting *Appelhans v. United States*, 877 F.2d 309, 313 (4th Cir. 1989)).

In this case, the justifications for application of the *Feres* doctrine seem especially strained. The torts alleged by Plaintiff do not implicate the relationship between the Army and one of is soldiers, as Defendant now acknowledges that Plaintiff was a civilian without any residual military status when he was, on the basis of mistaken information, arrested, detained and charged with desertion. Similarly, Plaintiff has no recourse to any benefits under the Veterans Benefits Act for compensation for his alleged injuries. And, while the *Feres* doctrine makes perfect sense when a plaintiff having active or reserve status files suit to challenge orders from his or her superior, this is not at play in this case because Plaintiff was a civilian at the time the alleged torts were committed. It is hard to imagine how there could be any significant threat to the maintenance of good order and discipline in the military by permitting a suit by a civilian against the military for committing intentional torts against him at a time when he had no military affiliation, even if the military mistakenly thought that he did.

None of this matters, says Defendant, because *Feres* nonetheless applies since the events that led the Army mistakenly to believe that Plaintiff still had an unfulfilled MSO that justified ordering him to active duty and deployment to Iraq related to a period of time when Plaintiff did have military status, even if the injuries he sustained when he was arrested, detained and charged did not. Def.'s Supplemental Mem. in Supp. 3–10. This argument has persuaded some courts. *See, e.g.*, *Kendrick v. United States*, 877 F.2d 1201, 1203–04 (4th Cir. 1989); *Henning v. United States*, 446 F.2d 774, 777 (3rd Cir. 1971). Others, however, outside of the Fourth Circuit, have permitted FTCA lawsuits against the Government by former servicemembers for tortious conduct that related back in some fashion to a time when they did have military status. *See, e.g.*,

*Jackson v. Tate*, 648 F.3d 729 (9th Cir. 2011) (Plaintiff, honorably discharged from the Washington Army National Guard ("ARNG"), was involuntarily ordered to active duty based on re-enlistment documents forged by an officer and noncommissioned officer. Plaintiff filed a declaratory judgment action challenging the order and the ARNG agreed to honorably discharge him. Thereafter plaintiff sued the two ARNG recruiters who forged the enlistment documents. The court held that the *Feres* doctrine did not apply because the tortious acts occurred after plaintiff's service had been completed and when he had no military status); *McGowan v. Scoggins,* 106 F.3d 844 (9th Cir. 1997) (holding that retired military officer who was detained and injured when he entered an Air Force Base to get a parking decal was not barred from suing the Government under *Feres* because the injury was not incident to any current military service); *Valn v. United States*, 708 F.2d 116 (3rd Cir. 1983) (FTCA claim for negligence in involuntarily ordering plaintiff, a former servicemember honorably discharged for medical reasons, to active duty allowed to proceed despite *Feres* defense).

While these cases suggest that *Feres* is not the impenetrable shield that Defendant believes it to be, they all come from circuits that have not adopted the highly deferential view taken by the Fourth Circuit, as articulated in *Stewart*, 90 F. 3d 102. While there no longer is any doubt that Plaintiff's arrest, detention and prosecution occurred while he was a civilian, without any military status, the adjudication of Plaintiff's tort claims unavoidably would involve the court in determining whether civilian and military members of the Army properly performed their duties. The inquiry necessarily would focus on the conduct of Plaintiff's superior officers at the time they mistakenly concluded that he continued to have an MSO which justified his involuntary orders to active duty for training and deployment, and concluded from his failure to obey those orders that he was a commissioned officer refusing orders to deploy during a period

when the Army was involved in fighting wars on two fronts.  The existing Fourth Circuit authority, as I read it, would not countenance such a judicial inquiry.  Ultimately, however, were I to conclude, as Plaintiff urges me to, that *Feres* did not divest this court of subject matter jurisdiction, his victory would be pyrrhic, because I have concluded that he failed to meet the limitations period for bringing an FTCA claim, and his lawsuit is barred for that independent reason.

### b.  Statute of Limitations

In the alternative, Defendant argues that Plaintiff has failed to satisfy an "essential prerequisite to an action under the FTCA (and a condition of the government's limited waiver of sovereign immunity)" because he failed to present "an administrative claim to the government within two years of the accrual of" his cause of action.  Def.'s Mem. 24.  In response, Plaintiff does not dispute that he was required to file the claim, but rather, challenges Defendant's calculation of the two-year period based upon the accrual date of the alleged torts committed. *See* Pls.' Opp'n 11–13.

"As a sovereign, the United States is immune from all suits against it absent an express waiver of its immunity."  *Welch v. United States*, 409 F.3d 646, 650 (4th Cir. 2005) (citing *United States v. Sherwood*, 312 U.S. 584, 586 (1941)).  However, the FTCA "effects a limited waiver of the United States' sovereign immunity for 'personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment.'"  *Welch*, 409 F.3d at 651 (quoting 28 U.S.C. § 1346(b)(1)).  Of particular relevance here, the FTCA contains a provision that states explicitly that a "tort claim against the United States shall be forever barred unless it is presented in writing to the appropriate Federal agency within two years after such claim accrues."  28 U.S.C. § 2401.

Indeed, "[c]ompliance with the FTCA's presentment requirement is a key jurisdictional prerequisite to filing suit." *See Moore v. United States*, Civil No.: CCB-08-1352, 2008 WL 4659048, at *2 (D. Md. Oct. 20, 2008) (citing *Kokotis v. U.S. Postal Serv.*, 223 F.3d 275, 278 (4th Cir. 2000)).

A plaintiff may bring a cause of action against the government under the FTCA "only if [he] would also have a cause of action under state law against a private person in like circumstances." *Miller v. United States*, 932 F.2d 301, 303 (4th Cir. 1991) (citing 28 U.S.C. § 1346(b) and *Corrigan v. United States*, 815 F.2d 954, 955 (4th Cir. 1987)). While state law "determines whether there is an underlying cause of action . . . federal law defines the limitations period and determines when that cause of action accrued." *Id.* (citing *Washington v. United States*, 769 F.2d 1436, 1437–38 (9th Cir. 1985)). A cause of action under the FTCA accrues "when the plaintiff knows, or in the exercise of due diligence should have known, that he is injured and of the cause of the injury." *Muth v. United States*, 1 F.3d 246, 250 (4th Cir. 1993) (citing *United States v. Kubrick*, 444 U.S. 111, 120 (1979) and *Gould v. U.S. Dep't of Health & Human Servs.*, 905 F.2d 738, 742 (4th Cir. 1990)). Here, Plaintiff and his wife have sued for negligence, false arrest, false imprisonment, and two counts of loss of consortium. The accrual date for these torts began to run when Plaintiff had "a complete and present cause of action"— that is, when he could "file suit and obtain relief." *See Wallace v. Kato*, 549 U.S. 384, 388 (2007) (internal quotation marks omitted).

i. *Count I: Negligence*

Plaintiff's first count, for negligence, stems from Plaintiff's allegation that an "unknown investigative or law enforcement officer of the United States Army negligently failed to adequately apprise him or herself of Plaintiff's true enrollment status before issuing a warrant for

[Plaintiff's] arrest for being AWOL," thereby causing Plaintiff damages. Compl. ¶¶ 20–21. The question becomes, then, when did Plaintiff know, or in the exercise of due diligence should he have known that he had a potential claim against the United States for the alleged negligent issuance of an arrest warrant? *See Muth*, 1 F.3d at 250 (internal citations omitted).

In his Complaint, Plaintiff alleges that he "received his discharge [from active duty] July 1, 2006"; recognized "the invalidity of [his] prior reserve enlistment"; "intentionally never signed the [O]ath" of Office sent to him by the Army to complete his appointment as a reserve officer, and "thus never consummated his legal enrollment in the Army Reserve." Compl. ¶ 9. Indeed, Plaintiff went on to accept full-time employment as a civilian. *Id.* ¶ 10. Plaintiff reiterates these allegations in his Opposition to Defendant's Motion to Dismiss as well as in his Supplemental Memorandum of Law in Opposition to Defendant's Motion to Dismiss. *See* Pls.' Opp'n 2–3 (stating that Plaintiff was released from active duty on July 1, 2006, that "at no time did [Plaintiff] ever complete the required Oath of Office" for the Army Reserve, and therefore, Plaintiff "had never been properly gained or joined into the active reserves"); Pls.' Supplemental Mem. in Opp'n 2 (stating that on July 1, 2006, Plaintiff was terminated as a member of the armed forces because he did not accept a reserve appointment). Thus, as of July 1, 2006, Plaintiff, by his own assertion, believed that he had not joined the Army Reserve and had no lingering military status or service obligation. These facts are not in dispute by Defendant. *See, e.g.* Def.'s Supplemental in Supp. 1–2. It would be difficult for Plaintiff to claim, then, that when he was arrested on June 20, 2008 pursuant to an Army warrant incorrectly classifying him as AWOL, that he did not know he had a cause of action against the United States on that date. The law is clear that a claim accrues when a Plaintiff knows "'both the fact of injury and its immediate physical cause.'" *Hensley v. United States*, 531 F.3d 1052, 1057 (9th Cir. 2008)

(quoting *Dyniewicz v. United States*, 742 F.2d 484, 487 (9th Cir. 1984)). Here, on June 20, 2008, Plaintiff knew that he had been incorrectly arrested and detained—he had sustained an injury and knew that the injury was caused by an arrest warrant issued by the United States Army and executed by the Maryland State Police. *See* Compl. ¶¶ 8–12. Accordingly, on June 20, 2008, Plaintiff was armed "with the critical facts to investigate [his] claim [for negligence] and present it within the two-year statute of limitations." *See Gould*, 905 F.2d at 743. Plaintiff failed to do so, as he did not file "a claim for damage, injury, or death, with the U.S. Army Claims Service, Office of Judge Advocate General" until July 2, 2010, over two years after the day he was arrested. *See* Compl. ¶ 5. "All waivers of sovereign immunity must be 'strictly construed . . . in favor of the sovereign,'" *Welch*, 409 F.3d at 650, and there is no doubt that the presentation of an administrative claim within two years is a "key jurisdictional prerequisite to filing suit under the FTCA," *Kokotis*, 223 F.3d at 278. Plaintiff has not satisfied this key jurisdictional prerequisite with regard to his negligence claim and therefore, Count I of Plaintiff's Complaint hereby DISMISSED as time-barred.

ii. *Count II and Count III: False Arrest and False Imprisonment*

Plaintiff's claims for false arrest and false imprisonment are more complex, and a brief discussion of the relevant substantive law is helpful. First, the "elements of a claim for false arrest or false imprisonment are the same under Maryland law: (1) the defendant deprived the plaintiff of his liberty; (2) without consent; and (3) without legal justification." *Hovatter v. Widdowson*, Civil No.: CCB-03-2904, 2004 WL 2075467, at *8 (D. Md. Sept. 15, 2004) (quoting *Heron v. Strader*, 761 A.2d 56, 59 (Md. 2000)); *accord Barnhill v. Strong*, Civil No. JFM-07-1678, 2008 WL 544835, at *3 (D. Md. Feb. 25, 2008); *Gray v. Maryland*, 228 F. Supp. 2d 628, 641 (D. Md. 2002). As stated previously, under federal law, the accrual date for these

torts begins once a Plaintiff knows of the existence of his injury and its cause . *See Muth*, 1 F.3d at 249.

To that end, Plaintiff argues that the "statute of limitations starts to run at the time of the cessation of the unlawful imprisonment, which was the time of his release."  Pls.' Opp'n 13.  Specifically, although Plaintiff was arrested on June 20, 2008, he was released from military custody on August 7, 2008.   Compl. ¶ 17.   If Plaintiff's claims for false arrest and false imprisonment began to accrue on the day of his release, August 7, 2008, his administrative claim would have been filed within the requisite two-year period provided under the FTCA.  Unfortunately, however, Plaintiff has cited no case law to support his position.   In contrast, Defendant cites *Wallace*, which clearly precludes Plaintiff's argument.   There, the Supreme Court discussed the common law torts of false arrest and false imprisonment, recognized that the torts overlap, and characterized the "two torts together as false imprisonment."  *Wallace*, 549 U.S. at 389.  Justice Scalia stated:

> Reflective of the fact that false imprisonment consists of detention without legal process, a false imprisonment ends once the victim becomes held *pursuant to such process*—when, for example he is bound over by a magistrate or arraigned on charges.   Thereafter, unlawful detention forms part of the damages for the entirely distinct tort of malicious prosecution, which remedies detention accompanied, not by absence of legal process, but by *wrongful institution* of legal process.

*Id.* at 389–90 (internal citations and quotation marks omitted) (emphasis in original).  The Court ruled that "petitioner's contention that his false imprisonment ended upon his release from custody, after the State dropped the charges against him, must be rejected."  *Id.* at 390.  Indeed, the Court stated that the petitioner's false imprisonment ended much earlier, "when legal process was initiated" against him.  *Id.*  Moreover, the Court noted:

> If there is a false arrest claim, damages for that claim cover the time of detention up until issuance of process or arraignment, but not more.   From that point on, any

> damages recoverable must be based on a malicious prosecution claim and on the
> wrongful use of judicial process rather than detention itself.

*Id.* Here, legal process was initiated against Plaintiff over one year *prior* to his arrest and subsequent detention. *See* Compl. ¶ 11. This is underscored by the fact that when he was arrested by the Maryland State Police on June 20, 2008, Plaintiff had been charged with desertion and a charge sheet had been signed, under oath, by a commissioned officer of the Army. Def.'s Mem. 7. Moreover, the charge sheet was received by the "Summary Court-Martial Convening Authority on September 27, 2007" and the United States Army issued a facially valid deserter warrant for Plaintiff's arrest.[3] *Id.* Thus, contrary to Plaintiff's contention that his claims accrued on the day his detention ended, Plaintiff's claims for false arrest and false imprisonment began to accrue on June 20, 2008, the day he was arrested. *See Wallace*, 549 U.S. at 390. On that date, Plaintiff knew that he had been deprived of his freedom, without his consent, and without legal justification and therefore, he had a complete, cognizable cause of action for both torts. *See Hovatter*, 2004 WL 2075467, at *8; *Heron*, 761 A.2d at 59. Assuming Plaintiff's false imprisonment began at all, it most certainly ended on the day that he was arrested pursuant to a facially valid arrest warrant—thereafter, any subsequent detention of Plaintiff would be recoverable only under the "entirely distinct tort of malicious prosecution."[4] *See Wallace*, 549 U.S. at 390. Though neither dispositive nor persuasive, this outcome is consistent with Maryland common law. *See, e.g.*, *Barnhill*, 2008 WL 544835, at *6 (holding that the torts of false arrest and false imprisonment "arise on the date that plaintiff was arrest and

---

[3] Defendant actually argues that under the *Wallace* framework, "no false imprisonment claim ever accrued" because Plaintiff was never detained without legal process. Def.'s Mem. 27. While there may be some merit to Defendant's assertions, the Court assumes, without deciding, that a false imprisonment claim did accrue.

[4] Plaintiff has not alleged a count of malicious prosecution in his present suit. *See* Compl.

detained by the police") (internal quotation marks omitted); *Hovatter*, 2004 WL 2075467, at *8 (stating that a "claim for false arrest or false imprisonment arises on the date of arrest" and dismissed as untimely plaintiff's claims for both where plaintiff was arrested in 1994 but did not file his claims until 2003, outside of the three year statute of limitations period); *Gray*, 228 F. Supp. 2d at 641 (citing Maryland substantive law and holding that "a cause of action for false arrest or false imprisonment accrues on the date of the arrest").

As with Plaintiff's negligence claim, Plaintiff had two years from the date of his June 20, 2008 arrest during which to present his administrative claim as required under the FTCA. Unfortunately, he failed to file the claim until July 2, 2010 and as such, his claims for false arrest and false imprisonment are also time-barred.[5]  Accordingly, Counts II and III of Plaintiff's Complaint are hereby DISMISSED.

### iii. *Count IV and Count V: Loss of Consortium*

Under Maryland law, loss of consortium "claim[s] can only be asserted in a joint action for injury to the marital relationship . . . tried at the same time as the individual action of the physically injured spouse." *Owens-Illinois, Inc. v. Cook*, 872 A.2d 969, 980 (Md. 2005).  Loss of consortium claims "arise[] from the loss of society, affection, assistance, and conjugal fellowship suffered by the marital unit as a result of the physical injury to one spouse through the tortious conduct of a third party." *Oaks v. Connors*, 660 A.2d 423, 428 (Md. 1995).  Thus, loss of consortium claims acknowledge "an interdependence between the injury to the marital unit

---

[5] In opposition, Plaintiff argues briefly that his false imprisonment was a continuing injury and that as such, the statute of limitations should be equitably tolled during that period. *See* Pls.' Opp'n 14.  However, this argument also is contradicted by *Wallace*, which makes clear that false imprisonment is not a "continuing injury" under the factual scenario present here. Indeed, as noted above, *Wallace* articulates that after the issuance of legal process, "any damages recoverable must be based on a malicious prosecution claim and on the wrongful use of judicial process rather than detention itself."  549 U.S. at 390.  Such is the case here.

and the action of the defendant that causes that injury." *Cook*, 872 A.2d at 980 (citing *Deems v. W. Md. Ry.*, 231 A.2d 514, 522 (Md. 1967)).  As a result, such claims are "'derivative of the injured spouse's claim for personal injury.'"  *Id.* at 981 (quoting *Oaks*, 660 A.2d at 430); *see also Klein v. Sears, Roebuck & Co.*, 608 A.2d 1276, 1284 (Md. Ct. Spec. App. 1992) ("When a physical injury results to a married person as a result of someone else's conduct, two injuries may arise: (1) the physical injury to the spouse who was directly injured by the tortious conduct and (2) the derivative loss of society, affection, assistance, and conjugal fellowship to [the] spouse.").  Simply stated, the loss of consortium claim "is inextricably tied to the underlying personal injury claim."  *John Crane, Inc. v. Puller*, 899 A.2d 879, 928 (Md. Ct. Spec. App. 2006).  The former cannot exist without the latter because "albeit distinct, [the claims] are nonetheless inseparable."  *See id.*  Here, Plaintiff's three underlying causes of action for negligence, false arrest, and false imprisonment, are time-barred.  As Plaintiff and his wife's subsequent claims for loss of consortium derive from those time-barred causes of action, they cannot stand alone.  *See, e.g.*, *Casey v. Geek Squad® Subsidiary Best Buy Stores, L.P.*, 823 F. Supp. 2d 334, 357–58 (D. Md. 2011) (precluding summary judgment as to claim for loss of consortium where plaintiff may be able to establish underlying prima facie case for negligence); *Cook*, 872 A.2d at 980; *Klein*, 608 A.2d at 1284.

**IV.    CONCLUSION**

Defendant's Motion to Dismiss Plaintiff's Complaint is hereby GRANTED.

A separate Order shall be issued concurrently with this Memorandum Opinion.


Dated: <u>July 24, 2013</u>                                          _____/s/_____
                                                                                     Paul W. Grimm
                                                                                     United States District Judge



mol